UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDY 10 BLACK LIVES MATTER, BRE ROBINSON, ASIAH BASSETT, SHANIECE LEWIS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-cv-1660 |
| THE CITY OF INDIANAPOLIS, | ) ) ) | JURY TRIAL REQUESTED |
| Defendant. | ) | |

**Complaint for Declaratory and Injunctive Relief and Individual Damages**

**Introduction**

1. The right to engage in peaceful protest is a right enshrined in the First Amendment. So is the Fourth Amendment right to be free from objectively unreasonable force from police authorities. Yet, when the plaintiffs in this case, and the members of the organizational plaintiff, sought to exercise this right, they were met with violent responses from the City of Indianapolis that included the use of tear gas, flash grenades, and pepper-ball projectiles, and shows of force by members of the Indianapolis Metropolitan Police Department ("IMPD"). This violated both the First and Fourth Amendments to the Constitution. The plaintiffs wish to continue to engage in their constitutional right of assembly and protest, but they justifiably fear a repetition of the improper behavior that was previously directed towards them by police authorities. They

[1]

seek declaratory and injunctive relief to ensure that the constitutional violations are not repeated, and the individual plaintiffs also seek their damages.

**Jurisdiction, venue, cause of action**

2. This Court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1331, 1343.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

4. Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202 and Rule 57 of the Federal Rules of Civil Procedure.

5. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

**Parties**

6. Indy10 Black Lives Matter is a membership organization based in Marion County, Indiana.

7. Bre Robinson is an adult resident of Marion County, Indiana.

8. Asiah Bassett is an adult resident of Marion County, Indiana.

9. Shaniece Lewis is an adult resident of Marion County, Indiana.

10. The City of Indianapolis is a municipal entity located in Marion County, Indiana.

**Facts**

*Introductory facts*

18. Following the murder of George Floyd in Minneapolis on May 25, 2020, protests have spread throughout the United States as persons have demonstrated against systemic

racism and the manner in which systemic racism has negatively influenced police actions towards persons and communities of color.

19.     The protesters have demanded changes in policing practices and the structure of police forces.

20.     In Indianapolis there have been protests beginning on May 29, 2020 and continuing through today's date with more protests planned in the future.

21.     Many of these protests are located in downtown Indianapolis.

22.     The protests have been almost entirely peaceful, although there was limited and isolated vandalism, looting, and violence on May 29 and 30, leading to a series of curfews imposed by the Mayor of Indianapolis, with the first curfew on May 31, 2020.

23.     The protests have been marred by officers of IMPD taking violent and unwarranted actions against peaceful protesters who were not engaged in any unlawful activity and who were not protesting during the curfew times.

24.     Unreasonable force has been utilized against persons who were protesting after curfew.

25.     Among other things protesters have been teargassed, attacked with pepper-balls shot from mechanical devices, and have been assaulted with flash grenades. IMPD officers have also used rubber bullets.

26.     Protesters have been met by IMPD officers who are wearing "battle-ready" riot garb.

27. Some of the officers have had police canines with them.

*Indy 10 Black Lives Matter ("Indy 10 BLM")*

28. Indy 10 Black Lives Matter ("Indy 10 BLM") was organized by ten Indianapolis residents in the aftermath of Michael Brown's shooting in Ferguson, Missouri in 2014.

29. Indy 10 BLM is a membership organization that is dedicated to serve, support, and love black people. It desires to, among other things, lift unheard voices of people of color and to build and grow local community.

30. Indy 10 BLM is particularly concerned about systemic racism in policing and the criminal justice system and the violence that is frequently perpetrated by police against persons of color.

31. To advance these goals, Indy 10 BLM, among other things, organizes community events and demonstrations, participates in task forces, holds press conferences, and meets with political leaders.

32. Following the murder of George Floyd in Minneapolis on May 25, 2020, Indy 10 BLM, in conjunction with other groups, planned and organized peaceful protests in Indianapolis that continue on a daily basis to this day.

33. These protests are designed to bring attention to the systemic racism in the criminal justice system and to police practices that negatively impact the black community and to effect positive changes in police practices.

34. The first such large scale demonstration occurred on Friday, May 29, 2020 and was centered in and around Monument Circle ("the Circle") in downtown Indianapolis.

35. Indy 10 BLM worked with other organizations to organize and publicize the demonstration.

36. Members of Indy 10 BLM were present for the protest on May 29, 2020.

37. On the 29th, after a peaceful day of protests at or near the Circle the group peacefully marched towards the State House but were met by IMPD officers in riot gear around Market and Illinois Streets.

38. Some in the group attempted to walk back to Monument Circle but were blocked by another group of IMPD officers.

39. Without warning IMPD officers then proceeded to throw and fire tear gas cannisters into the crowd causing pandemonium and dangerous conditions as persons, many blinded by and suffering the negative influences of being tear gassed, tried to escape.

40. IMPD officers also used pepper balls that were shot into the crowd.

41. "Tear gas" consists of aerosolized chemicals that cause severe irritations in the eyes, mouth, lung, and nose. It causes difficulty in breathing, pain in the eyes, uncontrollable watering in the eyes, and coughing.

42. Pepper-balls are projectiles that contain a powdered chemical that irritates the eye, nose, skin, and respiratory system. They are launched by a device similar to a paintball gun and open up upon impact, dispensing the chemical irritant.

43. It is painful to be hit by a pepper-ball or a tear gas container and being hit by either of these items may cause serious injury, particularly if an individual is struck in the head or neck with the device.

44. These aggressive actions by IMPD officers were without justification or cause. There was not adequate warning that the crowd needed to disperse. Nor was there any warning that chemical weapons were to be deployed.

45. Indy 10 BLM had members present at the demonstration as well as SURJ Indy and street medics.

46. SURJ Indy is a group of white allies of Indy 10 BLM.

47. The street medics were present to attend to any medical needs of protesters, although the hope was that it would not be necessary.

48. Indy 10 BLM expended money to buy medical supplies to care for protesters and helped to supply the street medics.

49. On May 30, BLM assisted in organizing another demonstration in downtown Indianapolis.

50. The demonstration started in the early afternoon with a rally at the Circle.

51. Later in the day, while it was still light outside, 200-300 persons, including Indy 10 BLM members, peaceably marched toward the City County Building in downtown Indianapolis.

52. They were met at the intersection of Alabama and Market Streets, immediately east of the City County Building, by IMPD officers in riot gear.

53. IMPD officers were also in front of the City County Building.

54. Some of the IMPD officers had leashed police canines with them.

55. The assembly of persons was peaceful.

56. One of the police officers announced that the assembly was illegal.

57. There was no cause to declare the peaceful assembly "illegal."

58. Almost immediately after this, IMPD officers began to indiscriminately throw or fire tear gas cannisters into the crowd.

59. They also shot pepper-balls into the crowd.

60. IMPD officers also exploded stun grenades, also called flash or flashbang grenades. These are explosive devices that emit an extremely loud sound and bright light upon detonation. They can cause temporary loss of sight and temporary hearing lost and are designed to disorient persons.

61. Stun grenades can be as loud as 175 decibels when they are detonated. A jet engine at 100 feet is only 140 decibels.

62. Again, as occurred the night before, the crowd dispersed in a dangerous panic.

[7]

63. On May 30, 2020, members of Indy 10 BLM met with the Mayor of Indianapolis. The Mayor spoke of his concerns about the destruction of property that had occurred during earlier protests. He did not comment on IMPD's use of force against peaceful protesters and he did not commit to not using force against peaceful protesters in the future.

64. On May 31, 2020, there was another demonstration sponsored by Indy 10 BLM in conjunction with other groups.

65. A curfew had been declared in Indianapolis on May 31, 2020, for 8 p.m. No curfew was present on May 29th or 30th.

66. On May 31, 2020, prior to the time that the curfew went into effect IMPD officers unnecessarily and without notice used tear gas on numerous occasions and in numerous locations to disperse peaceful protesters.

67. After the curfew went into effect IMPD officers unnecessarily used rubber bullets and batons to subdue protesters.

68. Since May 31, 2020, Indy 10 BLM has helped organize numerous protests and marches that its members and other persons have attended to challenge systemic racism and police practices.

69. Indy 10 BLM intends to continue to organize and assist with the organizing of such protests and marches and its members will continue to attend them.

70. Because of the violent response of IMPD officers fewer persons are attending these events than would otherwise attend if they could be assured of their safety.

71. In order for Indy 10 BLM to get its message across to decision makers and other persons, it is imperative that it has the maximum number of persons attending these events.

72. Indy 10 BLM has had to expend its scarce resources to prepare for police violence at protests by buying medical supplies and by expending time in obtaining donated supplies. This has caused the organization to divert necessary financial and other resources away from its overall mission.

73. Indy 10 BLM is therefore injured by the City's use of force against protesters and its members and those aligned with it.

*Plaintiff Bre Robinson*

74. On May 29, 2020, Bre Robinson was among the peaceful group of protesters, referred to above, near Illinois and Market Streets in downtown Indianapolis around 9:30 p.m.

75. She and the other protesters were exercising their First Amendment rights to engage in peaceful protest directed towards what they perceived as systemic racism affecting the actions of IMPD and other police officers towards persons and communities of color and demanding changes to IMPD and policing practices in Indianapolis and in the United States at large.

76. Protesters linked arms and faced a number of Indianapolis Metropolitan Police Department Officers who were in front of them.

77. She and the other protesters noted that a number of IMPD officers in vehicles pulled up on the other side of the group so that the protesters were between two groups of IMPD officers.

78. One of the officers, using a bullhorn, announced that this was no longer a lawful protest. He did not indicate why or what power he had to suspend the First Amendment in this way. Nor did he give any instructions as to how the crowd should disperse.

79. Within sixty seconds IMPD officers proceeded to throw or shoot tear gas cannisters into the crowd and fire pepper-balls at protestors.

80. A tear gas cannister landed next to Ms. Robinson causing her to immediately have intense stinging and burning in her eyes and respiratory difficulties.

81. She managed to get away from the officers and returned to her home where she attempted to remedy the pain and discomfort she was still feeling.

82. She suffered extreme respiratory problems for the next few days.

83. On May 30, 2020, she returned to engage in the protest march, described above, near the City County Building in downtown Indianapolis.

84. It was before dark and the crowd was peaceful.

85. The crowd marched north on Alabama Street, past the City County Building and then turned around.

86. All of a sudden, without warning or cause, the crowd was blanketed by tear gas being thrown and shot into the crowd by IMPD officers.

87. Pepper-balls were also shot.

88. The police detonated stun grenades, which were terrifying.

89. She and others ran into the pedestrian walkway that runs between Alabama and Delaware Streets directly north of the City Market.

90. She stopped to help protesters who had fallen to the ground and who were at risk of being crushed by the crowd.

91. Police followed them into this area and either fired or threw more tear gas at the protesters who, at this point, were just trying to get away.

92. She saw a young baby who had been exposed to the tear gas and was foaming at the mouth.

93. She saw a person who was in a wheelchair who was overcome by tear gas and was being attended to by street medics.

94. Since that time she has gone to a few protests but has restricted the amount of protest activities because of her fear of being once again exposed to tear gas, pepper spray and stun grenades.

95. When she has gone to protests, she has been extremely fearful and apprehensive, and she has passed up other opportunities to protest because of these fears.

*Plaintiff Asiah Bassett*

96. On May 30, 2020, Asiah Bassett was also in the large group of protesters near the City County Building in Indianapolis protesting what they perceived as systemic racism affecting the actions of the IMPD towards persons and communities of color and demanding changes to the IMPD and policing practices in Indianapolis and the United States.

97. The demonstration was entirely peaceful.

98. There were a large number of IMPD officers between the protesters and the City County Building.

99. At one point the protest moved away from the City County Building

100. However, after the group moved for a short distance, it reversed itself and moved back towards the City County Building

101. At that point, without any violence or threat of violence by the assembled protesters, a number of the IMPD officers fired or threw tear gas cannisters into the crowd, causing mass pandemonium.

102. Ms. Bassett, with a friend, tried to run away from the tear gas and ended up, with a number of persons, in a nearby alley that was relatively free of tear gas.

103. However, as Ms. Bassett and the group of 20-30 people stayed in the alley to seek shelter, IMPD officers came up behind them and lobbed tear gas cannisters in front of them.

104. The gas spread immediately coating Ms. Bassett's skin, burning her eyes, and getting into her throat.

105. She and her friend ran through the gas to get away from the police.

106. For a few minutes she could not see, and she had difficulty breathing.

107. This caused her a great deal of physical discomfort.

108. Ms. Bassett has returned to subsequent protests in the Indianapolis downtown area and will continue to do so as she thinks it is immensely important that these protests continue. However, she is concerned that her peaceful protests will again be met with violent reactions by IMPD.

*Plaintiff Shaniece Lewis*

109. On May 30, 2020, Shaniece Lewis was engaged in the peaceful protest, as set out above, near the City County Building in Indianapolis.

110. She had been protesting for 4-5 hours at Monument Circle before the crowd marched towards the City County Building.

111. She was present when IMPD officers fired or threw tear gas cannisters into the crowd.

112. A cannister exploded directly in front of her, causing a great deal of irritation, pain, and distress.

113. She also heard loud explosions that she assumes were flash grenades.

114. She saw IMPD officers lined up in front of the City County Building with dogs on leashes.

115. She and a friend who was with her left and attempted to alleviate the pain and discomfort by drenching their facers with milk and water.

116. She has been back to other protests. However, she is now extremely reluctant to engage in protest activities in the early evening or night as she believes that this is the time that it is most likely that IMPD officers will react with violence as they did on May 30, 2020.

*Concluding allegations*

117. At no point has any representative of the City of Indianapolis indicated that it was a mistake to use tear gas, stun grenades, and pepper-balls against peaceful protesters. At no point has a representative of the City promised not to use similar weapons in the future to suppress peaceful protest.

118. The violent response to the peaceful protests by the City of Indianapolis has led to persons being unwilling to exercise their rights to engage in peaceful protest.

119. During a meeting with a City-County Council committee on June 10, 2020, IMPD's police chief described the chemical agents utilized as "'our best line of defense for dispersing crowds without really doing harm.'" Fox 59. *IMPD chief addresses use of tear gas, Dreasjon Reed case in public safety committee meeting*, June 11, 2020, https://fox59.com/news/impd-chief-addresses-use-of-tear-gas-dreasjon-reed-case-in-public-safety-comm

ittee-meeting/ (last visited June 13, 2020) (quoting the police chief). He also indicated that Indianapolis had recently ordered tear gas.

120. The Chief of Police also acknowledged that riot control agents had affected those peacefully protesting, including a group of protesters from a church.

121. The items used by IMPD to interfere with and disperse peaceful protests are dangerous.

122. It is the practice or policy of the City of Indianapolis to utilize these items if deemed necessary by the City.

123. In addition to the tearing of eyes, blurred vision, respiratory difficulties, and burning and irritation caused by tear gas in general, these common side effects are particularly dangerous during the current pandemic as they may promote the spread of the diseases.

124. Moreover, serious injuries may occur if a protester is hit by a tear gas cannister. For example, it has been reported that a demonstrator in Fort Wayne has lost his eye after being hit in the face by a tear gas canister. Fox 55- WFFT.com, *Fort Wayne man loses eye after tear gas cannister hits him in face*, May 31, 2020, updated June 2, 2020, https://www.wfft.com/content/news/Fort-Wayne-teen-loses-eye-after-struck-by-tear-gas-canister-570911221.html (last visited June 13, 2020).

125. The 1993 Chemical Weapons Convention, signed by the United States, explicitly forbids the use of "riot control agents" like tear gas and pepper balls, "as a method of

warfare." Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, Art. I(5), *opened for signature* Jan. 13, 1993, 1874 U.N.T.S, available at https://treaties.un.org/doc/Treaties/1997/04/199704 29%2007-52%20PM/CTC-XXVI_03_ocred.pdf (last visited June 15, 2020).

126. Stun grenades may cause permanent hearing loss. They have also caused serious burns and injuries to persons struck by them.

127. The actions and the inactions of the defendant, its officers, agents, and employees, have had the effect of denying persons the ability to peaceably assemble and protest. They also represent objectively unreasonable uses of force.

128. The plaintiffs are suffering continuing harm in that their rights to peaceable protest have been and continue to be chilled by the actions and inaction of the defendant, its officers, agents, and employees.

129. The plaintiffs are suffering continuing harm in that they are threatened with the objectively unreasonable use of force by defendant, its officers, agents, and employees.

130. The individual plaintiffs have been damaged by the actions and inaction of defendant, its officers, agents, and employees.

131. Plaintiffs are being caused irreparable harm for which there is no adequate remedy at law.

132. At all times defendant, its officers, agents, and employees have acted under color of state law.

**Jury demand**

133. Plaintiffs request a trial by jury on all claims so triable.

**Legal claim**

134. The actions of the City of Indianapolis in attempting to interfere with and stop lawful protest activities in Indianapolis through the use of tear gas, stun grenades, pepper-ball projectiles, police dogs, rubber bullets, and other actions, violates the First Amendment to the United States Constitution.

135. The use of such things as teargas, stun grenades, pepper-ball projectiles, and rubber bullets against peaceful protesters was and is objectively unreasonable force in violation of the Fourth Amendment to the United States Constitution.

WHEREFORE, plaintiffs request that this Court:

1. Accept jurisdiction of this case and set it for hearing at the earliest opportunity.

2. Declare that the actions of the defendant, its officers, agents, and employees violated, and continue to violate, the First and Fourth Amendments as noted above.

3. Enter a preliminary injunction, later to be made permanent, enjoining defendant, its officers, agents, and employees from taking any actions designed to interfere with or stop protest activities, including, but not limited to, employing objectively unreasonable force through the use of tear gas, pepper-ball projectiles, stun grenades, and rubber bullets.

4. Award the individual plaintiffs their damages following a jury trial.

5. Award plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

      6.    Award all other proper relief.

> Kenneth J. Falk
> Gavin M. Rose
> Stevie J. Pactor
> ACLU of Indiana
> 1031 E. Washington St.
> Indianapolis, IN 46202
> 317/635-4059
> fax: 317/635-4105
> kfalk@aclu-in.org
> grose@aclu-in.org
> spactor@aclu-in.org
>
> Attorneys for Plaintiffs