UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDY 10 BLACK LIVES MATTER, | ) | |
| BRE ROBINSON, ASIAH BASSETT, | ) | |
| SHANIECE LEWIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01660-JMS-DLP |
| | ) | |
| THE CITY OF INDIANAPOLIS, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>**

**Introduction**

Persons in Indianapolis reacted to the murder of George Floyd in Minneapolis by quickly organizing demonstrations against systemic racism and its influence on police practices. The demonstrations were in downtown Indianapolis and drew numerous persons who wished to be heard on this fundamentally important issue concerning racial justice. During a number of the protests, peaceful protesters were met by Indianapolis Metropolitan Police Department ("IMPD") officers who indiscriminately employed tear gas, pepper balls, flash grenades, and shows of force to discourage and prevent the protests and those participating in them. The weapons and force were deployed not only against persons in the streets—some of which had been closed off by the police—but also against persons on sidewalks, in a park, and at the Soldiers and Sailors Monument. Indeed, IMPD officers actively pursued protesters who were not on the streets to tear gas them and shoot pepper balls at them. Demonstrations continue, and the City and IMPD have not indicated that this police behavior will not recur. The actions of the City and IMPD violated both the First

[1]

and Fourth Amendments to the United States Constitution.

The plaintiffs, an organization active in the protests and individuals who have protested in the past and want to do so in the future without fear of again being subject to dangerous and painful attacks by the police, seek a preliminary injunction to prevent the City and IMPD from taking any actions that interfere with their lawful protest and from utilizing objectively unreasonable force against them and other protesters. A preliminary injunction should issue without bond.

**Facts**[1]

On May 25, 2020, George Floyd was murdered by a police officer who, while detaining Mr. Floyd, suffocated him by kneeling on his neck for eight minutes and forty-six seconds. *See, e.g.,* https://www.cnn.com/2020/06/24/us/minneapolis-police-chief-comment-george-floyd-trnd /index.html (last visited July 4, 2020). In the wake of that killing, protests against police brutality—and in particular violence against the Black community—sprung up around the country. *See, e.g.,* https://www.nytimes.com/interactive/2020/06/13/us/george-floyd-protests-cities-photos.html (last visited July 4, 2020).  Indianapolis was no exception, and beginning on May 29, 2020, protesters convened in the sidewalks, parks, and streets of the downtown area to engage in peaceful demonstrations against police violence.  In a series of use-of-force incidents, as described below, those demonstrations were met with the very violence at which their speech was aimed.

## A.     The plaintiffs

Indy 10 Black Lives Matter ("Indy 10 BLM") is a membership organization that was founded in 2014 and is dedicated to serving, supporting, and loving Black people.  Dkt. 19-1 at 1. The organization exists, among other reasons, to lift unheard voices of people of color and to build and grow local community.  *Id.*  From its very creation, Indy 10 BLM has been particularly

---

[1]     Plaintiffs reserve the right to present further evidence in response to the defendant's submissions, and reserve the right to supplement this factual statement with information adduced during the discovery process.

concerned about systemic racism in policing and the criminal justice system and the violence that is frequently directed by police against persons of color.  *Id.* at 2.  To advance its organizational goals, Indy 10 BLM has organized community events and demonstrations, participated in task forces, held press conferences, and met with and discussed issues with political leaders.  *Id.*  Although Indy 10 BLM is not formally incorporated, it operates Facebook, Twitter, and Instagram accounts and has funds that are maintained as Indy BLM funds.  *Id.*  Through its various media platforms, it also serves as a clearinghouse to let interested persons in the community know of upcoming events and matters of interest.  *Id.*

Plaintiffs Asiah Bassett, Shaniece Lewis, and Bre Robinson are residents of Marion County who have engaged in the protests described herein, and who wish to continue their protest activities in the future.  *See* Dkt. 19-2; Dkt. 19-3; Dkt. 19-4.

**B.**     **The events of May 29, 2020**

In the late afternoon and early evening of May 29, 2020, protesters assembled at Monument Circle ("the Circle") in downtown Indianapolis to engage in peaceful demonstrations.  Dkt. 19-1 at 2-3; Dkt. 19-17 at 1.  Among those protesting were members of Indy 10 BLM.  Dkt. 19-1 at 3. Indy BLM had helped to publicize the protest and also, although it was not expecting the violent reaction that protesters received, brought medical supplies and other materials on which it had expended its limited organizational resources. Dkt. 19-1 at 2-3. The protesters positioned themselves on the sidewalk along the interior of the Circle, adjacent to the Soldiers and Sailors Monument, where they were able to remain until the group grew more numerous.  Dkt. 19-1 at 3. As the group's number increased, eventually the Indianapolis Metropolitan Police Department ("IMPD") closed the Circle to vehicular traffic, while protesters on foot were permitted to continue their activities.  Dkt. 19-1 at 3; Dkt. 19-17 at 1.  The group peacefully conducted their protest

activities around the Circle.  Dkt. 19-1 at 3; Dkt. 19-17 at 1.

At some point in the early evening, as a group of protesters stood along the interior of the Circle, out of the street, the police arranged themselves opposite the group.  Dkt. 19-17 at 1. Without giving any order, warning, or other communication, a police officer raised a container of pepper spray and sprayed into the assembled group, hitting several protesters in the face, from approximately one foot away.  Dkt. 19-17 at 2, manually filed "Video".   The pepper spray caused extreme physical discomfort, and those affected were treated by volunteer medics on the scene. Dkt. 19-17 at 2.

Eventually, some individuals in that group of protesters, including members of Indy 10 BLM, departed from the Circle and marched around downtown, at one point returning to the Circle, and then departing again.  Dkt. 19-1 at 3; Dkt. 19-2 at 1; Dkt. 19-17 at 2.  The group eventually made its way to Market Street, which appeared to have been closed to vehicular traffic by the IMPD, using both the street and the sidewalks.  Dkt. 19-1 at 3; Dkt. 19-2 at 2.  As they traveled the block of Market Street between Capitol Avenue and Illinois Street, the protesters encountered IMPD officers in front of them, assembled along Market Street blocking the intersection, dressed in riot gear.  Dkt. 19-1 at 3; Dkt. 19-2 at 2.  Additional officers then aligned themselves behind the group of protesters, such that the group was hemmed in by law enforcement.  Dkt. 19-2 at 2.  At that point, an IMPD officer, using a bullhorn, announced that the protest was no longer "lawful," but did not order the assembled crowd to disperse.[2]  Dkt. 19-2 at 2.

Within 60 seconds of that announcement, without any warning or other communication indicating that force would be used, police began to indiscriminately launch tear gas canisters into the assembled crowd, hitting both those positioned in the street and those standing on sidewalks.

---

[2]       Many protesters did not hear any such announcement.  *See* Dkt. 19-1 at 4; Dkt. 19-17 at 2.  No curfew had been declared for May 30th.  Dkt. 19-2 at 2.

Dkt. 19-1 at 4; Dkt. 19-2 at 2; Dkt. 19-17 at 2.[3]  Police also shot pepper balls into the group of

protesters.  Dkt. 19-1 at 4; Dkt. 19-2 at 2.  The protesters, including Indy 10 BLM members and

Ms. Robinson, immediately felt the effects of the tear gas, including burning in their eyes, nose,

and throat, and respiratory distress.  Dkt. 19-1 at 4; Dkt. 19-2 at 3; Dkt. 19-8 at 1-2.

There was no apparent means for the group to disperse, either prior to the use of the

chemical weapons or to escape their effects, because police had created blockades on both sides

of the protesters.  Dkt. 19-2 at 2.  There was pandemonium as the protesters attempted to flee,

---

[3]    "Tear gas" is a riot control agent consisting of "chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs, and skin." Centers for Disease Control and Prevention, Emergency Preparedness and Response, *Facts About Riot Control Agents – Interim Document*, "What riot control agents are," https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp (last visited July 5, 2020).

People exposed to riot control agents may experience some or all of the following symptoms immediately after exposure:

- Eyes: excessive tearing, burning, blurred vision, redness
- Nose: runny nose, burning, swelling
- Mouth: burning, irritation, difficulty swallowing, drooling
- Lungs: chest tightness, coughing, choking sensation, noisy breathing (wheezing), shortness of breath
- Skin: burns, rash
- Other: nausea and vomiting

Long-lasting exposure or exposure to a large dose of riot control agent, especially in a closed        setting, may cause severe effects such as the following:

- Blindness
- Glaucoma (a serious eye condition that can lead to blindness)
- Immediate death due to severe chemical burns to the throat and lungs
- Respiratory failure possibly resulting in death

*Id.* at "Immediate signs and symptoms of exposure to a riot control agent."  "The effects of exposure to a riot control agent are usually short-lived (15–30 minutes) after the person has been removed from the source and decontaminated (cleaned off)." *Id.* at "How riot control agents work."

Pepper spray is also a riot control agent that works similarly to tear gas. *Id.* at "How you could be exposed to riot control agents." Unlike tear gas, which can consist of various chemicals, *id.* at *What riot control agents are*, pepper spray consists of oleoresin capsicum. *See, e.g., Wilson v. Johnson*, No. 4:18-cv-310-RH-MJF, 2020 WL 3052530, *16 n.10 (N.D. Fla. March 31, 2020).

"Pepper balls are rifle-fired projectiles that break into pieces upon impact and release oleoresin capsicum power (commonly known as mace), thereby causing both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289 (10th Cir. 2008) (internal quotation marks and citation omitted).

suffering the effects of the tear gas that impaired their vision and caused disorientation.  Dkt. 19-1 at 4.  One group of protesters ran down a nearby alley, but a group of police officers, seeing the protesters running away, raised and pointed their guns at the group, before lowering them and walking away.  Dkt. 19-17 at 2.  Many individuals suffered the effects of the chemical weapons, and Indy 10 BLM members attempted to render them assistance in the aftermath of the attack. Dkt. 19-1 at 4.

Meanwhile, another group of protesters remained gathered at the Circle.  The Circle was still closed to vehicular traffic, and protesters remained there on foot, engaging in peaceful protest activities.  Dkt. 19-15 at 1.  At approximately 8:30 p.m., as protesters were gathered on the east side of the Circle, without warning or order to disperse, police deployed tear gas and pepper balls into the gathered crowd.  Dkt. 19-15 at 1.  The protesters dispersed as a result of this use of force. *Id.*

## C.     The events of May 30, 2020

On May 30, 2020, beginning in the early afternoon, peaceful rallies and protest activities resumed in downtown Indianapolis, beginning again at Monument Circle.  Dkt. 19-1 at 4; Dkt. 19-4 at 1; Dkt. 19-19 at 1. Again, Indy 10 BLM assisted in spreading the word that about the activities and again they expended limited resources on medical supplies. Dkt. 19-1 at 4.  In the late afternoon, many protesters left the Circle to participate in a march around downtown, which other supporters joined as it progressed.  Dkt. 19-1 at 5; Dkt. 19-2 at 3; Dkt. 19-4 at 1; Dkt. 19-5 at 1; Dkt. 19-6 at 1; Dkt. 19-9 at 1; Dkt. 19-14 at 1; Dkt. 19-19 at 1.  Members of Indy 10 BLM, as well as the individual plaintiffs, participated in this march.  Dkt. 19-1 at 4-5; Dkt. 19-2 at 3; Dkt. 19-3 at 1; Dkt. 19-4 at 1.

Eventually the protesters marched in the direction of the City-County Building.  Dkt. 19-1

at 5; Dkt. 19-2 at 3; Dkt. 19-9 at 1; Dkt. 19-4 at 1; Dkt. 19-5 at 1; Dkt. 19-6 at 1; Dkt. 19-14 at 1; Dkt. 19-19 at 1.   Members of Indy 10 BLM, as well as the individual plaintiffs, continued to participate.   Dkt. 19-1 at 6; Dkt. 19-2 at 3; Dkt. 19-3 at 1; Dkt. 19-4 at 2. At some point, IMPD closed off vehicular traffic in the vicinity of Alabama and Market Streets, and as such, protesters were walking in the road and along the sidewalks.   Dkt. 19-2 at 3; Dkt. 19-3 at 2; Dkt. 19-4 at 2. As the protesters approached the intersection of Market and Alabama Streets, they were stopped by police, who were dressed in riot gear and arrayed across the intersection on foot and in vehicles, blocking passage.   Dkt. 19-1 at 5; Dkt. 19-4 at 2; Dkt. 19-5 at 1; Dkt. 19-6 at 1; Dkt. 19-9 at 1; Dkt. 19-14 at 1; Dkt. 19-17 at 2; Dkt. 19-19 at 1.   Some officers were accompanied by police dogs, (Dkt. 19-1 at 6, Dkt. 19-4 at 2), and there were many officers in riot gear amassed both outside and inside the City-County Building, (Dkt. 19-3 at 1, Dkt. 19-6 at 1).

By now, the protest group numbered in the hundreds as it came to a stop at the intersection. Dkt. 19-1 at 5-6; Dkt. 19-4 at 1; Dkt. 19-17 at 2.   Throughout the march, and as it arrived at the intersection, all of the march activities had been peaceful and passed without incident with the police.   Dkt. 19-1 at 5; Dkt. 19-3 at 1; Dkt. 19-4 at 1-2; Dkt. 19-19 at 1.   However, the police were already pointing tear gas launchers and pepper ball guns at the assembled protesters as they arrived. Dkt. 19-19 at 1.   When the front of the group reached the blockade created by police officers, the first several rows of protesters knelt on the ground and placed their hands in the air, chanting "hands up, don't shoot." Dkt. 19-19 at 2.   The group remained here, in a peaceful stasis, for several minutes. Dkt. 19-6 at 1; Dkt. 19-9 at 1; Dkt. 19-14 at 2; Dkt. 19-19 at 2.   From within the assembled crowd, a handful of firecrackers was ignited, and a plastic water bottle was lobbed in the direction of police.   Dkt. 19-5 at 1-2; Dkt. 19-14 at 2.   Police, however, did not react to either of these events. Dkt. 19-5 at 1-2; Dkt. 19-14 at 2.

[7]

Some protesters eventually heard police make an announcement that the assembly was unlawful, (Dkt. 19-1 at 6, Dkt. 19-14 at 2), but many protesters heard no announcement at all, (Dkt. 19-2 at 3; Dkt. 19-3 at 2; Dkt. 19-5 at 2; Dkt. 19-6 at 1; Dkt. 19-9 at 1; Dkt. 19-17 at 3; Dkt. 19-19 at 2).  Regardless, police issued no orders to disperse, warnings, or other communications that force, including chemical agents, would be used against the protesters.  Dkt. 19-1 at 6; Dkt. 19-2 at 3; Dkt. 19-3 at 2; Dkt. 19-4 at 2; Dkt. 19-5 at 2; Dkt. 19-6 at 1; Dkt. 19-9 at 1; Dkt. 19-14 at 2; Dkt. 19-17 at 3;  Dkt. 19-19 at 2.  Suddenly, police began to fire tear gas canisters and pepper balls indiscriminately into the crowd assembled both in the street and on the sidewalks.  Dkt. 19-1 at 6; Dkt. 19-2 at 4; Dkt. 19-3 at 2; Dkt. 19-4 at 2; Dkt. 19-5 at 2, 4-5; Dkt. 19-6 at 1; Dkt. 19-9 at 1, manually filed "Video 1" and "Video 2"; Dkt. 19-14 at 2; Dkt. 19-17 at 3; Dkt. 19-19 at 2.  Police also deployed "flash-bang" or "stun" grenades.[4]  Dkt. 19-1 at 6; Dkt. 19-2 at 4; Dkt. 19-4 at 2.  Police fired tear gas and pepper balls directly into the front several rows of kneeling protesters, hitting some of them.  Dkt. 19-19 at 2, manually filed "Video".

The deployment of these chemical weapons created a chaotic scene, with protesters attempting to quickly escape the toxic effects of the tear gas and pepper balls.  ;Dkt. 19-1 at 6; Dkt. 19-5 at 2; Dkt. 19-9 at 1.  Protesters again suffered from the painful physical effects of the chemical agents, including burning of the eyes, nose, and throat and respiratory distress.  Dkt. 19-1 at 6; Dkt. 19-2 at 4; Dkt. 19-4 at 2; Dkt. 19-5 at 2; Dkt. 19-6 at 1; Dkt. 19-9 at 2; Dkt. 19-14 at 2; Dkt. 19-17 at 3; Dkt. 19-19 at 3.  Despite the protesters' attempts to disperse, police nonetheless continued firing tear gas and pepper balls into and around the crowd, hemming them in with clouds of toxic chemicals and projectiles.  Dkt. 19-5 at 2; Dkt 19-14 at 2; Dkt. 19-19 at 3.  There was

---

[4]      A "flash-bang grenade is a light/sound diversionary device designed to emit a brilliant light and loud noise upon detonation. Its purpose is to stun, disorient, and temporarily blind its targets, creating a window of time in which police officers can safely enter and secure a potentially dangerous area." *Boyd v. Benton,* 374 F.3d 773, 776 (9th Cir. 2004).

simply no way to escape without passing through the chemical agents.  Dkt. 19-19 at 3.  Police continued to fire additional canisters of tear gas well after the mass of protesters had scattered, and after the protesters were clearly attempting to disperse.  Dkt. 19-5 at 2.

Some individuals suffered particularly acutely from the chemical weapons, including two young girls who had become separated from their parents during the chaos, and had to be treated by volunteer medics, (Dkt. 19-17 at 3), protesters who suffered asthma attacks and risked losing consciousness, (Dkt. 19-17 at 3, Dkt. 19-14 at 2), and protesters who could not safely leave the area, and risked additional injury from other protesters during the chaos of their retreat, due to mobility impairments, (Dkt. 19-2 at 4).  And due to the indiscriminate nature of the IMPD's use of force, individuals in the area who were not participating in protest activities were nonetheless subjected to the use of chemical weapons.  A woman was waiting with a baby at a bus stop as the above events unfolded, and she and the child were overwhelmed by tear gas, causing the baby to froth at the mouth.  Dkt. 19-17 at 3.

Police also targeted protesters with further attacks as they attempted to flee.  A group of protesters, including Ms. Robinson, Ms. Bassett, and Ms. Lewis, ran down a pedestrian walkway near the City Market in order to evacuate the area.  Dkt. 19-2 at 4; Dkt. 19-3 at 2; Dkt. 19-4 at 2. They were chased by police into the walkway, which is bordered by two buildings, where police lobbed tear gas canisters in front of them, preventing their forward movement.  Dkt. 19-3 at 2; Dkt. 19-4 at 2.  Police did so despite the fact that these individuals were physically removed from the scene of the protest and were clearly trying to leave.  Dkt. 19-2 at 4; Dkt. 19-3 at 2; Dkt. 19-4 at 2.

One group of protesters was targeted by police and had tear gas canisters launched at them on the fifth floor of a parking garage by police on the ground who saw them recording the unfolding

scene.  Dkt. 19-14 at 2-3.  Police continued to target peaceful protesters throughout that night, shooting tear gas into groups of people peacefully gathered or walking along sidewalks.  Dkt. 19-15 at 2, manually filed "Video".

**D.     The events of May 31, 2020**

On May 31, 2020, protesters again gathered in downtown Indianapolis to engage in numerous, peaceful protests.  As described below, as the day unfolded, many of these separate protest events ended with police teargassing the peaceful protesters.

In the early afternoon, protesters assembled on Monument Circle, which remained closed to traffic, and where speakers had gathered to present to the crowd.  Dkt. 19-7 at 1.  Police appeared to be stationed on the tops of some of the buildings that surround Monument Circle.  Dkt. 19-7 at 1.  At approximately 4:00 p.m., over a loudspeaker, police informed the assembled group that they were participating in an unlawful assembly and ordered them to disperse, under the threat of arrest. Dkt. 19-7 at 1.  Before the protesters had the opportunity to comply, police began launching tear gas canisters indiscriminately into the crowd.  Dkt. 19-7 at 1; *see also* Dkt. 19-15 at 2-3.

As these events unfolded, other protests were occurring elsewhere in the downtown area. One large group of protesters was peacefully marching around downtown.  Dkt. 19-5 at 3; Dkt. 19-6 at 2; Dkt. 19-13 at 1; Dkt. 19-16 at 1.  In the early evening, around 6:00 p.m., that group was marching south on Pennsylvania Street, both on the sidewalks and in the street, and due to the number of participants, it spanned the large part of a city block.  Dkt. 19-12, manually filed "Video" at 0:00 - 0:35; Dkt. 19-13 at 1; Dkt. 19-16 at 1.  As the group slowly advanced along Pennsylvania Street protesters began to notice police officers amassing.  Dkt. 19-5 at 3; Dkt. 19-6 at 2; Dkt. 19-16 at 1; *see also* Dkt. 19-12, manually filed "Video" at 0:38.  At some point, police made an announcement that the group was unlawfully present in the street, (Dkt. 19-6 at 2),

although many protesters heard no such announcement, (Dkt. 19-5 at 3, Dkt. 19-13 at 1, Dkt. 19-16 at 1).  While the group was still quite a distance from the police, and without issuing an order to stop or disperse, or any communication or warning that force would be used against the protesters, police began to launch tear gas canisters into the crowd—both those in the street and those on the sidewalk.  Dkt. 19-5 at 3; Dkt. 19-6 at 2; Dkt. 19-11 at 2, manually filed "Video 1"; Dkt. 19-12, manually filed "Video" at 0:38 – 1:00; Dkt. 19-13 at 1; Dkt. 19-16 at 1-2; Dkt. 19-17 at 3; Dkt. 19-18 at 1.

The protesters attempted to flee, with some running into nearby University Park, and some running down nearby streets.  Dkt. 19-6 at 2; Dkt. 19-12, manually filed "Video" at 1:19 - 1:40; Dkt. 19-13 at 1; Dkt. 19-16 at 2; Dkt. 19-17 at 3; Dkt. 19-18 at 1.  The police continued to fire tear gas, and one protester was hit in the back of her head with a tear gas canister, knocking her down, as she moved away from the police.  Dkt. 19-12, manually filed "Video" at 2:03.  Approximately 18 officers eventually moved just south of the intersection of Pennsylvania and New York Streets, where they were joined by other officers.  Dkt. 19-12, manually filed "Video" at 2:56.  A number of officers congregated around a vehicle with an open back, where it appears that they obtained more tear gas canisters. *Id.* at 3:13.  Officers can be seen exchanging fist bumps. *Id.* at 3:45 - 3:50.

Some of the protesters regrouped in University Park, near the corner of Pennsylvania and New York Streets, and continued to engage in peaceful demonstration.  Dkt. 19-16 at 2.  Others retreated further north into the park, attempting to treat their exposure to tear gas.  Dkt. 19-6 at 2-3.  After a few minutes, the police began to walk across the intersection of New York and Pennsylvania Streets, heading north. Dkt. 19-12, manually filed "Video" at 5:13 - 5:25.  There was a small group of protesters in the street, but there were also protesters on the sidewalks, in the parking lane on the street, and in the park.  Dkt. 19-6 at 2-3; Dkt. 19-12, manually filed "Video"

at 5:13; Dkt. 19-18 at 1. Again without warning or any other communication, police began shooting tear gas into the peaceful protesters on the street, on the sidewalks, in the parking lane, and those assembled in the park.  Dkt. 19-6 at 3; Dkt. 19-12, manually filed "Video" at 5:13 - 6:33; Dkt. 19-18 at 1.  Many of those protesters left the park in separate groups to escape the tear gas, and were tear gassed yet again, including at the corners of Delaware and Michigan Streets, (Dkt. 19-6 at 3), and Vermont Street and Capitol Avenue, (Dkt. 19-13 at 2; Dkt. 19-16 at 2; Dkt. 19-18 at 2).

At some point, while several officers stood in the intersection of New York and Pennsylvania Streets, a white sport utility vehicle drove up New York Street to the intersection. Dkt. 19-11 at 2, manually filed "Video 2".  The driver of the car then honked the horn, in apparent solidarity with the protesters.  *Id.*  Some sort of communication occurred between an occupant of the video and police officers who were standing in the intersection.  *Id.*  After backing up, the vehicle drove through the intersection, at which point police launched a canister of tear gas directly into the vehicle.  *Id.*  The vehicle included at least four occupants—two adults and two children under the age of five—who were overtaken by the tear gas and suffered medical distress as a result of tear gas being fired at point-blank range into the vehicle.  Dkt. 19-11 at 2-3, manually filed "Video 3".

During this time, another group of protesters was marching around downtown, chanting and engaging in peaceful demonstration.  Dkt. 19-10 at 1.  Any time that the group became stationary, police, dressed in riot gear, would use their vehicles, bikes, and bodies to move in toward the group, block intersections, and channel the group's movement.  *Id.*  When the group saw police begin to amass at the intersection of New York Street and Capitol Avenue, it began to retreat away from the intersection toward a large parking lot.  *Id.* At this point, without warning, communication, or any other order to disperse, police began launching tear gas canisters into

[12]

groups of protesters both in the street and on the sidewalk.  *Id.* at 2, manually filed "Video 1".
They also launched tear gas canisters over the group, in the direction in which it was attempting
to retreat, in order to block the group's exit.  *Id.* at 2.  Even after protesters had retreated from the
area near the officers, police continued to launch tear gas far afield into them.  *Id.*

After attempting to treat the effects of the tear gas and reconvening, the group headed
toward Monument Circle.  *Id.*  The Circle appeared to be blocked off to vehicular traffic by snow
plows stationed across streets.  *Id.* at 2, 5.  The group marched on the sidewalks to the intersection
of Washington and Meridian Streets, where it gathered on the northeast and northwest quadrants
of the intersection on the sidewalk and the cultural trail.  *Id.* at 2; Dkt. 19-16 at 2.  Police cars
blocked traffic moving north and south along Meridian Street.  Dkt. 19-10 at 2, 6.  The group stood
on the sidewalks, chanting, and again without warning, any order to disperse, or other
communication, police began firing tear gas directly into the crowds of people assembled on the
sidewalks.  Dkt. 19-10 at 3, manually filed "Video 2"; Dkt. 19-16 at 2.  Protesters were again
overtaken by the effects of the tear gas.  Dkt. 19-10 at 3; Dkt. 19-16 at 2.

Around this time, protesters again assembled at Monument Circle, which remained closed
to vehicular traffic.  Dkt. 19-7 at 2; Dkt. 19-18 at 2.  Police did not prevent them from gathering
or order them to disperse, despite the prior use of force against the protesters who had assembled
earlier in the day.  Dkt. 19-7 at 2; Dkt. 19-18 at 2.  This assembly included many members of local
church groups, who were worshipping and singing inside the bollards at the Soldiers and Sailors
Monument.  Dkt. 19-7 at 2; Dkt. 19-18 at 2, manually filed "Video".  Without warning or order to
disperse, police began to fire tear gas into the peacefully assembled group, which included children
and at least one individual in a wheelchair.  Dkt. 19-7 at 2; Dkt. 19-18 at 2, manually filed "Video".

**E.**     **Effects of the uses of force on protest activities**

As described in detail above, these uses of force employed by the IMPD had the immediate effect of halting the activities of those who were engaged in peaceful protest, in addition to causing pain and suffering.  But on top of that, those uses of force have led some individuals to cease engaging in protest activities at all, due to their fears of violence by police.  Dkt. 19-1 at 7; Dkt. 19-19 at 3.  Many people, including the plaintiffs, have continued to engage in protest activities, but they do so with a sense of fear that they may be attacked by the IMPD and subjected to violence at the hands of police.  Dkt. 19-1 at 8; Dkt. 19-2 at 5; Dkt. 19-3 at 3; Dkt. 19-4 at 2; Dkt. 19-7 at 2.  Indy 10 BLM has also found it necessary to expend some of its limited resources to buy medical supplies in preparation for its protest activities, and to use those supplies to treat individuals who have been injured by tear gas and pepper balls at protests.  Dkt. 19-1 at 7.

The City of Indianapolis has provided no indication that it will cease engaging in the use of tear gas and pepper balls against protesters if it deems such actions necessary, and appears to have taken the position that chemical weapons were used appropriately in the incidents described above.  In remarks to the Public Safety and Criminal Justice Committee of the City-County Council on June 10, 2020, IMPD Police Chief Randal Taylor stated that "chemical weapons are probably the least lethal force that we can use," and that "we would hate to go back to things like water guns, or dogs, or anything like that.  Those chemical agents really are our best line of defense without really doing harm." Public Safety Committee, beginning at approximately 2:30:00, http://indianapolis.granicus.com/player/clip/19976?view_id=3 (last visited July 10, 2020).  He also stated that IMPD has recently made an order for additional chemical weapons.  *Id.* at approximately 2:56:00.  According to Chief Taylor:

> we only use those riot control agents during riots where violent crowds are causing life threatening conditions. . . .  Their primary goal is to disperse the crowd to stop the violent actions of those who are causing these life-threatening actions. Riot control agents are always a last resort and have never been used on peaceful

[14]

protestors or protests that violated the law but did not cause life-threatening actions.

*Id.* at approximately 2:10:00. As the foregoing facts illustrate, Chief Taylor's description of the activities of protesters, and subsequent uses of force, are not supported by the evidence regarding when force was actually deployed.

**The preliminary injunction standard**

The Seventh Circuit has noted that

> [t]o obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits. If a plaintiff makes such a showing, the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. This assessment is made on a sliding scale: The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. Finally, the court must ask whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties. Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted.

*Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (citations and quotation marks omitted), *cert. denied*, --U.S.--, 140 S. Ct. 384 (2019).

**Argument**

**I.      Plaintiffs will prevail on the merits of their claims**

**A.      The plaintiffs are likely to prevail on their First Amendment claim**

**1.      The plaintiffs and the other protesters were engaged in political protest, activity entitled to the highest protection under the First Amendment**

It is axiomatic that "[t]he First Amendment provides that all citizens have a right to hold and express their personal political beliefs." *Abay v. City of Denver*, __ F. Supp. 3d __, No. 20-cv-01616-RBJ, 2020 WL 3034161, *3 (D. Colo. June 5, 2020) (citing *Cohen v. Calif.*, 403 U.S. 15, 24 (1971)) (granting temporary restraining order against police authorities employing chemical weapons or projectiles against protesters). "The First Amendment reflects a profound national

commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks and citation omitted).

The greatest protection is accorded to speech in public fora. "The Supreme Court has emphasized in a long line of cases that robust political discourse within a traditional public forum is the lifeblood of a democracy." *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality, Repression and Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008) (citing *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)). Thus, "streets and parks . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indust. Org.*, 307 U.S. 496, 515 (1939). "[S]idewalks and other public ways occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *Price v. City of Chicago*, 915 F.3d 1107, 1111 (7th Cir. 2019), *cert. denied*, 2020 WL 3578739 (July 2, 2020).

Of course, there are limits on the robust protection provided to expressive activities in public fora. "The First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). But "police may not interfere with demonstrations unless there is a 'clear and present danger' of riot, imminent violence, interference with traffic or other immediate threat to public safety." *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). "Neither energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest." *Id.* at 58 (internal citations omitted).

As noted above, the facts demonstrate that on May 29, May 30, and May 31, plaintiffs and the other protesters engaged in political protest on sidewalks, in a park, at the Soldiers and Sailors

Monument, and on streets that had been closed to vehicles.[5]  They "engaged in the constitutional right to protest policy brutality. They exercised their right on public fora. . . . [T]heir protests have been passionate but peaceful, and they must be protected even if they stand in opposition to the police." *Black Lives Matter Seattle-King Co. v. City of Seattle*, __ F. Supp. 3d __, No. 2:20-cv-00887-RAJ, 2020 WL 3128299, *3 (June 12, 2020) (granting a temporary restraining order against the use of chemical irritants or projectiles against peaceful protesters). These are "activities at the heart of what the Bill of Rights was designed to safeguard." *Jones*, 465 F.3d at 56.

### 2. The City violated the First Amendment rights of the plaintiffs and other protesters

#### a. The actions of the City and IMPD amounted to unconstitutional retaliation in violation of the First Amendment

The cases that have recently entered temporary restraining orders against police use of chemical and other weapons against protesters following the murder of George Floyd have all done so by asking whether the police action, and threatened future action, amounted to retaliation against the protesters in violation of the First Amendment. *Black Lives Matter Seattle-King Co.*, 2020 WL 3128299, *2; *Don't Shoot Portland v. City of Portland*, No. 20-cv-00917-HZ, 2020 WL 3078329, *3 (D. Or. June 9, 2020); *Abay*, 2020 WL 3034161, *3. The Seventh Circuit has held that to prevail on such a claim, plaintiffs must show that "(1) [they] engaged in activity protected by the First Amendment; (2) [they] suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (internal quotation marks and citation omitted). As noted, it is clear that the plaintiffs and

---

[5]      Having closed streets in response to the protests, the City cannot claim that there was a "clear and present danger of . . . interference with traffic upon the public streets" justifying impingement on the First Amendment rights of the protesters on those streets. *Cantwell*, 310 U.S. at 308.

the other protesters "were engaged in constitutionally protected activity through organized political protest." *Abay*, 2020 WL 3034161, at *3. The other factors are also easily met.

In analyzing whether the actions of the City and IMPD are likely to deter future exercise of expressive conduct "[w]e apply an objective test: whether the alleged conduct by the defendants would likely deter a future person of ordinary firmness from continuing to engage in protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). This objective standard means that a defendant may not "escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in [her] protected activity." *Mendocino Environmental Ctr. v. Mendocino Cty*, 192 F.3d 1283, 1300 (9th Cir. 2009). It also means that the threat of action against protected activity "is sufficient to state a First Amendment chilling claim." *Vanidestine v. Marinette Co. Jail*, No. 18-C-1776, 2019 WL 1586864, at *6 (E.D. Wis. Apr. 12, 2019). For, "[t]he First Amendment prohibits threats of punishment designed to discourage future protected speech." *Surita*, 665 F.3d at 878.

Plaintiffs and the other protesters were subject to chemical attack by weapons banned by international treaty for use in war[6] that caused the plaintiffs and other protesters pain and suffering. The flash grenades that IMPD employed were loud and terrifying. The recent cases that have granted temporary restraining orders preventing the use of similar weapons have all recognized the obvious: deploying these weapons against peaceful protesters has a chilling effect on First Amendment expression. *See Black Lives Matter Seattle-King Co.*, 2020 WL 3128299, at *4; *Don't Shoot Portland*, 2020 WL 3078329, *3 (indicating that the issue was not contested); *Albay*, 2020

---

[6]        The 1993 Chemical Weapons Convention, signed by the United States, explicitly forbids the use of "riot control agents" like tear gas and pepper balls, "as a method of warfare." Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, Art. I(5), *opened for signature* Jan. 13, 1993, 1874 U.N.T.S, available at https://treaties.un.org/doc/Treaties/1997/04/19970429%2007-52%20PM/CTC-XXVI_03_ocred.pdf (last visited June 15, 2020).

WL 3034161, at *3.  The same is true here.

Plaintiff Robinson has noted that she has restricted the number of protests she is attending and how long she remains because of her continuing fear of being exposed to tear gas, pepper spray, and stun grenades. Dkt. 19-2 at 6. She would like to return to future protests and rallies without the fear of being again attacked. *Id.*   Similarly, plaintiff Lewis, after being subjected to chemical weapons and flash grenades while protesting, and being pursued by IMPD officers who fired more tear gas canisters at her as she tried to escape on a sidewalk, is extremely reluctant to engage in protest during the early evening hours when she believes she is most likely to be attacked again. Dkt. 19-4 at 3.  Plaintiff Bassett has continued to go to protests but remains extremely concerned that she will again be subject to unwarranted and excessive use of force while engaged in peaceful protests. Dkt. 19-3 at 3. Not surprisingly, Indy 10 BLM notes that the violent responses of IMPD officers towards the protesters has led to fewer persons attending the protests because of fears for their safety. Dkt. 19-1 at 7. "Peaceful demonstrators' legitimate and credible fear of police retaliation is silencing their political speech—the very speech most highly valued under the First Amendment." *Abay*, 2020 WL 3034161, *3.

It is also clear that the protesters' First Amendment activities were at least a "motivating factor" in the use of chemical and other weapons against the plaintiffs and the other protesters. *Bridges*, 557 F.3d at 546. As an initial matter, the City cannot claim that the unlawful actions of a few justified the violent suppression and discouragement of the First Amendment rights of protesters who were not breaking the law. "The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Collins v Jordan*, 110 F.3d 1363, 1371-72 (9th Cir. 1996) (further citations

[19]

omitted). "The use of indiscriminate weapons against all protesters—not just the violent ones—supports the inference that [IM]PD's actions were substantially motivated by Plaintiffs' exercise of their First Amendment rights." *Black Lives Matter Seattle-King Co.*, 2020 WL 3128299, \*3.

Nor can the City claim that IMPD was merely lawfully attempting to clear the streets as a justification for its actions. It bears repeating that many streets were closed to vehicular traffic, and traffic control interests simply cannot be asserted to suppress the First Amendment rights here. In any event, the evidence is clear that the plaintiffs and other protesters were pursued by IMPD officers and attacked, not just when they were on streets that had been closed to traffic, but while they were on sidewalks, walkways, and in a park. *See supra,* p. 4 (protesters pepper sprayed at Monument Circle); 4-5, 8-10, 11-13 (protesters tear gassed on sidewalks); 6, 10, 14 (protesters tear gassed at Monument Circle); 9-11 (protesters tear gassed on sidewalks, while fleeing through pedestrian walkway, and in parking garages); 7-10 (protesters tear gassed at Monument Circle); 11-12 (protesters tear gassed in University Park). Tear gas was shot at persons who were driving in their cars. *See supra,* pp. 12-13. Young children were teargassed. *See supra,* pp. 9. Clearly "preventing criminal activity . . . was not the sole purpose of [IM]PD's use of force." *Don't Shoot Portland*, 2020 WL 3078329, at \*3. It was designed to punish and deter the First Amendment activities of the plaintiffs and the other protesters and that is precisely what it did and continues to do. It was, and continues to be, unconstitutional.

    **b.**    **The actions of the City and IMPD cannot be deemed to be a reasonable time, place and manner regulation of speech**

Even if unconstitutional retaliation was not involved here, the City's punitive attempt to regulate the protesters' First Amendment activities would be unconstitutional. To be constitutional, regulation of political speech in public fora must be content neutral, narrowly tailored, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781,

791 (1989). Even assuming that the City behaved in a content neutral fashion towards the peaceful protesters, a point that plaintiffs do not concede, it did not leave the protesters any alternative venues within which to protest as it expelled them from downtown sidewalks, closed streets, a park, and the Soldier's and Sailor's Monument. It, in effect, made downtown Indianapolis a "no-protest zone." "A city couldn't without violating freedom of speech and assembly flatly ban groups of people from spontaneously gathering on sidewalks or in the public parks in response to a dramatic news event." *Vodak v. City of Chicago*, 639 F.3d 738, 749 (7th Cir. 2011). This is precisely what the City attempted to do.

Additionally, the narrow tailoring requirement is not met here. It is the City's obligation to "show[] that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests,'" *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994) (quoting *Ward*, 491 U.S. at 799). Presumably the City will attempt to argue that it was not targeting the demonstrators, but merely attempting to assure public safety.  But the City did not direct its force only against persons in streets that it had not closed, but against demonstrators in closed streets, on sidewalks, at the Soldiers and Sailors Monument, and in a park, all places where there was no public safety need to dispel the protesters. This was a total ban on expression. The Supreme Court has noted that a complete ban on a First Amendment activity can be narrowly tailored if "each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). The City's ban was not the least bit targeted and it cannot demonstrate narrow tailoring.

### 3.   Conclusion

The irony cannot be avoided. While engaging in peaceful protests to demonstrate against police violence, the plaintiffs and others were subject to violence that was designed to suppress

the protests and that succeeded, in part, in doing so. The actions of the City and IMPD violated the First Amendment, and the violation continues to this day as the City has not backed down from its position that such force may be deployed against non-violent protesters in public fora.

**B.      The plaintiffs are likely to prevail on their Fourth Amendment claim**

The Fourth Amendment to the U.S. Constitution, of course, guarantees to individuals the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Because this "reasonableness" inquiry is "not capable of precise definition or mechanical application," this inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation omitted). And "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). The plaintiffs' Fourth Amendment claim therefore presents two questions. First, does the City effect a seizure when it deploys tear gas, pepper balls, and similar uses of force against protesters not engaged in violent activity? And second, if so, is that seizure, or the force used to effect that seizure, unreasonable? The answer to both questions is an unequivocal "yes."

**1.      The City's use of force effects a Fourth Amendment seizure of the plaintiffs and other protesters**

1.      "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation and citation omitted). However, in order to effect a seizure, it is not necessary that a police officer actually succeed in subduing an individual. Rather, "the mere grasping or application of physical force with lawful

[22]

authority, whether or not it succeeded in subduing the arrestee, [i]s sufficient." *California v. Hodari D.*, 499 U.S. 621, 624 (1991).  In other words, "an officer's application of physical force always constitutes a seizure." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011); *see also, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 876 n.4 (9th Cir. 2012) ("[W]hen [officers'] show of authority includes *the application of physical force*, a seizure has occurred even if the object of that force does not submit.")  (citing *Hodari D.*, 499 U.S. at 624) (emphasis in original).

> As the Seventh Circuit has explained:

> This is not to say, of course, that every state law battery by a police officer constitutes a Fourth Amendment seizure. . . .   Certain types of non-restraining physical contact, without a concomitant showing of authority, are just too minor to constitute a 'seizure' for Fourth Amendment purposes without doing violence to that word.  See *Leaf v. Shelnutt,* 400 F.3d 1070, 1091 (7th Cir. 2005) (nudging sleeping suspect to wake him not a seizure); *Martinez v. Nygaard,* 831 F.2d 822, 826-27 (9th Cir. 1987) (grabbing individual's shoulder from behind to get his attention not a seizure).

*Acevedo v. Canterbury*, 457 F.3d 721, 724-25 (7th Cir. 2006).  The court in *Acevedo* thus distinguished the circumstance "in which a state animal welfare investigator confronted the plaintiff in her yard, knocked her to the ground, and then dug his fingernails into her arm before walking away"—where no seizure occurred, *see McCoy v. Harrison*, 341 F.3d 600, 605-06 (7th Cir. 2003)—from the circumstance in which an individual was "knock[ed] to the ground in a location far away from his home under the general control of the police" and "black[ed] out momentarily," *see* 457 F.3d at 725.  It the latter circumstance, the force is sufficient enough to constitute a Fourth Amendment seizure.  *See id.*

Addressing the distinction between *McCoy* and *Acevedo*, another court in this district has held that "directly spray[ing]" an individual with pepper spray constitutes a seizure, for the use of force results in "severe injuries, including eye irritation, trouble breathing, rashes, nose irritation, and excessive mucus."  *Bernal v. Johnson*, No. 13-CV-06726, 2014 WL 4976212, at *4 (N.D. Ill.

[23]

Sept. 25, 2014) (citing multiple cases reaching the same conclusion); *see also, e.g.*, *Quraishi v. St. Charles Cnty.*, No. 4:16-CV-1320, 2019 WL 2423321, at *3 (E.D. Mo. June 10, 2019) ("Firing tear gas, pepper spray, or other chemical agents at someone can constitute a seizure under the Fourth Amendment.") (collecting cases), *appeal pending*, No. 19-2462 (8th Cir.).   Other courts have reached similar conclusions with respect to the deployment of force specifically in the context of an attempt to disperse a crowd.  *See, e.g.*, *Otero v. Wood*, 316 F. Supp. 2d 612, 621 n.5 (S.D. Ohio 2004) (applying Fourth Amendment to plaintiff's excessive force claim where plaintiff alleged that police fired wooden batons at her as part of a crowd-dispersal technique); *Secot v. City of Sterling Heights*, 985 F. Supp. 715, 720-21 (E.D. Mich. 1997) (applying Fourth Amendment to excessive force claim in case involving use of baton to move protesters); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1265-66 (C.D. Ill. 1996) (applying Fourth Amendment to excessive force claim in case involving use of pepper spray on protesters).

2.      But the application of force to a particular individual is not necessary to demonstrate a Fourth Amendment seizure.  This is because a seizure occurs not merely when officers seek to *detain* an individual; it occurs when officers seek to *limit the freedom of movement* of an individual.  *See, e.g.*, *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (reiterating that a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." (emphasis removed).

Applying *Brower* and jurisprudence announcing similar principles, multiple courts have concluded that police officers effect a seizure when force is deployed in an attempt to disperse a crowd.  For instance, in *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258 (D. Ore. Sept. 8, 2003), the plaintiffs alleged that officers deployed pepper spray and rubber bullets against a crowd of protesters in an attempt to move the protesters "back approximately 120 feet"

and further away from a political fundraising event.  *Id.*, 2003 WL 23540258, at *1.  The court

rejected the defendants' argument that "the Fourth Amendment is not offended by the intentional

use of force that physically injures a citizen and only *reduces* his or her freedom of movement."

*Id.*, 2003 WL 23540258, at *10 (emphasis in original).  Concluded the court:

> [O]n August 22, 2002, the police physically moved the protesters approximately
> 120 feet in order to create a larger entryway to the street.  Defendants used pepper
> spray and physical force to achieve this movement.  Clearly the effect of
> defendants' actions was to control plaintiffs' movement.

*Id.*  Insofar as officers "physically mov[ed] certain plaintiffs and circumscribe[d] the area of

movement of other plaintiffs," the plaintiffs were seized under the Fourth Amendment.  *Id.*

A similar result was reached in *Coles v. City of Oakland*, Nos. C03-2961 & C03-2962,

2005 WL 8177790 (N.D. Cal. Apr. 27, 2005).  In *Coles*, several protester-plaintiffs alleged that

they were "herded" by police officers (through the use of "wooden bullets, bean bags, grenades,

batons, and motorcycle hits") from the Port of Oakland, where they were protesting the economic

involvement of local companies in the war in Iraq, to a subway station more than a mile away.  *Id.*,

2005 WL 8177790, at *1, 4.  "The Supreme Court in *Brower*," explained the court, "required only

that a person's *freedom of movement* be terminated, not that the person's *movement* be terminated."

*Id.*, 2005 WL 8177790, at *5.  Thus, "[t]he dispositive question is one of control: Did the police

control the plaintiff's movement through the use of force intentionally applied for that purpose?"

*Id.*  Where police exhibit an "intent to terminate an individual's freedom of movement by . . .

means through which freedom of movement is actually terminated," a seizure occurs.  *Id.*, 2005

WL 8177790, at *6.  Other district courts have adopted the reasoning of *Marbet* and *Coles* under

indistinguishable circumstances.  *See, e.g.*, *Jennings v. City of Miami*, No. 07-23008-CIV, 2009

WL 413110, at *7-9 (S.D. Fla. Jan. 27, 2009) (use of tear gas, pepper spray, beanbags, and other

weapons against protestors); *Rauen v. City of Miami*, No. 06-21182-CIV, 2007 WL 686609, at *5-

8 (S.D. Fla. Mar. 2, 2007) (use of pepper spray, beanbags, and teargas to "herd" protestors).

3.      Viewed either through the lens of the City's use of physical force or through the lens of its restrictions on the movement of protesters—or, more likely, through both lenses at once—it is clear that the City has exhibited a practice or policy of seizing peaceful protesters in its downtown area.  Through its police force, it intentionally and indiscriminately deploys tear gas, pepper-ball weapons, stun grenades, and other dangerous weapons against individuals engaged in peaceful protest.  It does so for the purpose of controlling the movements of the protesters.  And it does so without regard to where those individuals are located, even deploying various uses of force against protesters in public parks[7], on sidewalks[8], on streets that have been closed to vehicular traffic[9], or fleeing down a pedestrian walkway.[10]  The City effects Fourth Amendment seizures.[11]

## 2.      The City's use of force is objectively unreasonable and therefore violates the Fourth Amendment

The question, then, is whether the seizures effected by the City, and the degree of force utilized to effect these seizures, are reasonable.  They are not.

---

[7]      Several affiants have testified to the use of force on persons in parks.  *See* Dkt. 19-6 at 3; Dkt.19-16 at 1-2; Dkt. 19-18 at 1.  It is also evident from video evidence.  *See* Dkt. 19-12, manually filed "Video" at 5:13 - 6:33.

[8]      Several affiants have testified to the use of force on persons on sidewalks.  *See* Dkt. 19-10 at 2-3; Dkt.19-15 at 2; Dkt. 19-16 at 1-2;  Dkt. 19-17 at 2-3; Dkt. 19-18 at 1-2.  It is also evident from video evidence.  Dkt. 19-10, manually filed "Video 1" and "Video 2"; Dkt. 19-12, manually filed "Video"; Dkt. 19-15, manually filed "Video".

[9]      Several affiants have testified to the use of force on persons on streets that had been closed to vehicular traffic.  *See* Dkt. 19-1 at 3-4; Dkt. 19-2 at 2-4; Dkt. 19-3 at 2; Dkt. 19-4 at 2; Dkt. 19-6 at 2; Dkt. 19-7 at 1-2; Dkt. 19-9 at 1-2; Dkt. 19-10; Dkt. 19-15 at 2; Dkt. 19-17 at 1-2; Dkt. 19-19 at 2.  It is also evident from video evidence.  Dkt. 19-9, manually filed "Video 1"; Dkt. 19-10, manually filed "Video 1" and "Video 2"; Dkt. 19-12, manually filed "Video".

[10]      Several affiants have testified to the use of force on persons fleeing down a pedestrian walkway.  *See* Dkt.19-2 at 4; Dkt. 19-3 at 2-3; Dkt.19-4 at 2.

[11]      The fact that the City has targeted not only protestors actively obstructing traffic or engaged in similar behavior but also protestors on sidewalks and in parks renders this case distinguishable from cases such as *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1259-60 (E.D. Wash. 2005), *on reconsideration*, 2005 WL 8158928 (E.D. Wash. Dec. 9, 2005), in which the court refused to conclude that persons who were not intentionally targeted but had suffered "secondary exposure" from chemical spray had been seized within the meaning of the Fourth Amendment.

1.     The evidence demonstrates that a substantial number of persons against whom force has been deployed—who were "seized" under the Fourth Amendment—were not even committing a minor infraction, such as obstructing vehicular traffic or engaging in protest activities after a declared curfew.  Rather, the City has deployed significant force against persons engaged in lawful protest in parks, on sidewalks, and on streets closed to vehicular traffic.  It should require no citation to demonstrate that, regardless of the *amount* of force deployed, the City's seizure of these persons is unreasonable—the probable cause necessary to detain them was entirely lacking.  *See, e.g.*, *Carlson v. Bokovic*, 621 F.3d 610, 622 n.19 (7th Cir. 2010) ("A seizure without probable cause is conceptually different from a seizure that employs excessive force; both are unreasonable, but for different reasons.") (citing numerous cases); *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) ("Where an arrest occurs without probable cause, the plaintiff may bring a claim for unreasonable seizure.").

It is of no consequence that others in the vicinity might have committed minor infractions, for "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."  *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  Rather, "where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another."  *Id.*  The City's actions are violative of the Fourth Amendment insofar as it has deployed force against persons engaged in clearly lawful behavior.  No greater showing is necessary.  *See, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1158 (10th Cir. 2008) ("The defendants' arguments that the police had probable cause to arrest Fogarty rest on characterizations of the protest in general, and not on Fogarty's individual actions.  The Fourth Amendment plainly

requires probable cause to arrest Fogarty as an individual, not as a member of a large basket containing a few bad eggs.").

2.      The degree of force deployed by the City to effect the seizures of persons who may have been committing minor infractions—such as obstructing traffic or protesting after a declared curfew—was excessive, even if probable cause may have existed to issue a citation or even to arrest some persons.  Of course, "[c]laims of excessive force in the case of a seizure are analyzed under the objectively reasonable standard of the Fourth Amendment."  *Soller v. Moore*, 84 F.3d 964, 968 (7th Cir. 1996) (citation omitted).  This requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  In conducting this inquiry, courts are to pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest."  *Id.*   Each of these factors demonstrates the excessiveness of the City's force.

First, "[t]he severity of the crime at issue is extremely minimal," and "did not involve physical violence or damage to property."  *Madison v. City of Evansville*, No. 3:14-cv-00072-TWP-WGH, 2015 WL 9455670, at *8 (S.D. Ind. Dec. 23, 2015).  Any minor crime that might have been committed by some protesters "is a far cry from crimes that contain the use of force as an element, crimes involving possession of illegal weapons, or drug crimes, all of which are associated with violence."  *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (addressing the first prong of the *Graham* analysis); *see also, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (holding that, insofar as the plaintiff's "infraction was among the least severe crimes contemplated by New Mexico law," the force deployed "should have been reduced accordingly");

*Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (holding that when a plaintiff is suspected of committing a nonviolent misdemeanor, this fact "reduces the level of force that [i]s reasonable for [an officer] to use"); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 & n.11 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else.") (citing cases).

Second, the protesters have not posed an immediate (or a non-immediate) threat to anyone's safety. The plaintiffs do not dispute that some incidents of looting occurred in Indianapolis and nationwide, but the protests themselves have been almost entirely peaceful. The Tenth Circuit addressed similar circumstances in an action brought by an antiwar protester who was arrested while drumming on the steps of a bookstore:

> [W]e find no suggestion that [the plaintiff] posed an immediate threat to the safety of the officers or others. At the point when the officers used force against him, Fogarty was kneeling on the steps of the bookstore. He was unarmed and had been drumming intermittently and peacefully. Even if his behavior played a role in inciting the crowd to remain in the middle of Central Avenue, which is contrary to Fogarty's version of events, it remains far from clear that the protesters presented any immediate threat to the officers or public safety.

*Fogarty*, 523 F.3d at 1160. But even this misses the point: the City has evidenced a policy of deploying weapons of substantial force against persons *without regard to whether those persons posed a threat to anyone's safety*. It has done so against peaceful protesters, against persons actively trying to flee the area in order to avoid the City's tactics, against individuals doing nothing but recording the activities of police, and, in one widely reported incident, even against a church group engaged in a prayer vigil.[12]

---

[12] Dkt.19-18 at 2-3, manually filed "Video"; *see also* Karen Campbell, *Church members caught in tear gas during peaceful vigil amid protests*, WTHR.com, June 2, 2020, *at* https://www.wthr.com/article/news/local/church-members-caught-tear-gas-during-peaceful-vigil-amid-protests/531-b5b61d69-62ab-4caf-aa25-775359847658 (last visited July 3, 2020).

And third, the protesters were not actively resisting arrest, for no attempt was made to arrest them.  A police officer with reason to believe that an individual has committed a criminal offense may, of course, issue a citation to that individual or even arrest him or her.  If the suspect proceeds to resist arrest, increasing degrees of force may prove necessary.  But here, a display of overwhelming force has been the City's first step, not its last.  *See, e.g.*, *Madison*, 2005 WL 9455670, at *8 ("[W]hile Madison did not immediately follow the officers' command to put down his cell phone, he did not physically resist the officers or attempt to flee.").

Ultimately, while *Connor* supplies the jurisprudential lens through which the plaintiffs' excessive-force argument must be analyzed, whether or not the City's use of force was "reasonable" need not be lost in legal niceties: the substantial evidence of police officers' extreme and unnecessary conduct, much of which has been captured on indisputable video recordings, is addressed at length above.  Another court in this circuit addressed the use of pepper spray against a crowd of protesters as follows:

> In the instant case the *Connor* factors help the plaintiffs. The severity of the crime at issue is negligible, being at most trespass.  The plaintiffs did not pose an immediate threat to the safety of the officers or others.  They were unarmed protestors exercising their First Amendment rights.  Under any version of the facts the demonstrators were not actively resisting arrest; they were marching, chanting and protesting.  The police arrested only one demonstrator, and that was after he had been sprayed with pepper spray.  The *Connor* factors highlight the uniqueness of the factual context of the instant case.  This is not a typical excessive force case where the police were struggling with a fleeing felon or a rebellious prisoner.  Instead, the police were monitoring a peaceful, lawful and constitutionally protected demonstration.

*Lamb v. City of Decatur*, 947 F. Supp. 1261, 1265 (C.D. Ill. 1996).  In a variety of circumstances, courts have concluded that the use of chemical irritants, rubber bullets, flash-bang devices, and other non-lethal weapons represent excessive force when deployed against peaceful protesters. *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 878-83 (9th Cir. 2012) (use of pepperball weapon

in crowd of students); *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1129-30 (9th Cir. 2002) (use of pepper spray against nonviolent protesters who had fastened themselves together in a series of demonstrations against the logging industry); *Black Lives Matter Seattle-King County,* 2020 WL 3128299, at *4 (use of chemical weapons and other projectiles against demonstrators) (decision on TRO); *cf. United States v. Morris*, 349 F.3d 1009, 1012 (7th Cir. 2003) ("This Court has often emphasized the dangerous nature of flash-bang devices and has cautioned that the use of such devices in close proximity to suspects may not be reasonable.") (citing cases).

The plaintiffs are likely to prevail on their claim that the City's actions are violative of the Fourth Amendment.

## II.      The other factors for the grant of a preliminary injunction are met here

1.      <u>Irreparable harm for which there is no adequate remedy at law</u>      The Supreme Court has stressed that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Given this, "money damages are therefore inadequate." *Joelner v. Village of Washington Park. Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (citation omitted). "[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages." *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (citing *Flower Cab Co. v. Petitte,* 685 F.2d 192, 195 (7th Cir. 1982)). Although the violence that marred the peaceful protests of May 29-May 31 has not been repeated, the City has not disclaimed its right to use such violence in the future and the threat of it continues to depress the willingness of persons to exercise First Amendment right to this date. The plaintiffs continue to be "chilled" regarding their First Amendment rights and the harm to these rights therefore continues unabated.

Of course, plaintiffs are also faced with continuing violations of their Fourth Amendment

[31]

rights. However, "[c]ourts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g., Cohen v. Coahoma County, Miss*., 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that a violation of constitutional rights constitutes irreparable harm as a matter of law.").

2.    The balance of harms            Without an injunction, the plaintiffs are faced with a continuing violation of their constitutional rights and continued exposure to harm. As the Seventh Circuit has noted, if the government "is applying [a] policy in a manner that violates [] First Amendment rights. . . then [the government's] claimed harm is no harm at all." *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). And, the City cannot claim that it is harmed by denying it the ability to violate the constitutional rights of the plaintiffs and protesters. The bottom line is that "any harm in limiting Defendant's use of tear gas [and the other weapons previously employed] is outweighed by the irreparable harm that Plaintiffs—engaged in peaceful protest—are likely to endure." *Don't Shoot Portland*, 2020 WL 3078329, at *4.

3.    The public interest    "The vindication of constitutional rights serves the public interest." *Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner*, 194 F. Supp. 3d 818, 836 (S.D. Ind. 2016) (citing *Joelner*, 378 F.3d at 620; *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)). Thus, the public interest is served by the enforcement of the Constitution and by the grant of a preliminary injunction.

4.    The bond requirement           The issuance of a preliminary injunction will not impose any monetary injuries on the City. In the absence of such injuries, no bond should be required. *See, e.g., Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). *See also, e.g.,*

*Black Lives Matter Seattle-King County*, 2020 WL 3128299, \*6 ("Because this is a non-commercial case, the balance of hardships favors Plaintiffs, and there is no realistic likelihood of harm to the City of Seattle from enjoining its conduct, the Court waives the security bond requirement.").

**Conclusion**

A preliminary injunction must therefore issue, without bond, to prevent the continuing harm caused by the City's improper and unreasonable use of force against protesters. The City must be enjoined from taking any actions designed to interfere with or stop lawful protest activities and must be prohibited from utilizing objectively unreasonable force against any protest activity, which would include. but not be limited to, preventing the City from utilizing tear gas, pepper-ball projectiles, stun grenades, and rubber bullets.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiffs